866 So.2d 51 (2004)
Lawrence Joey SMITH, Appellant,
v.
STATE of Florida, Appellee.
No. SC01-2103.
Supreme Court of Florida.
January 29, 2004.
*53 James Marion Moorman, Public Defender, and Paul C. Helm, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Candance M. Sabella, Senior Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
Lawrence Joey Smith appeals his convictions of first-degree murder and attempted first-degree murder, and his respective sentences of death and life imprisonment. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm the convictions and sentence of life imprisonment for attempted first-degree murder, and remand to the circuit court for resentencing by the trial court for the first-degree murder conviction.

I. FACTS
On the evening of September 13, 1999, Faunce Pearce visited Bryon Loucks at Loucks' home, which was also his place of *54 business, and asked Loucks' teenage stepson, Ken Shook, to obtain for him a book of 1000 geltabs (LSD) for $1200. Shook called two friends, Stephen Tuttle and Robert Crawford, who in turn called another friend, Amanda Havner. Havner contacted her source for drugs, Tanya Barcomb, who said she could obtain the geltabs. Tuttle, Crawford, and Havner then went to Loucks' home, where Pearce gave them the money and indicated that they should not return without either the money or the drugs. The four teenagers went to Barcomb's house, where Barcomb indicated that she, her boyfriend, and Havner would obtain the drugs from a supplier while the boys remained behind. After arriving at an apartment complex, Barcomb told Havner to stay in the car. Barcomb and her boyfriend then entered a friend's apartment, and her boyfriend hid the money in his own shoe after punching himself in the face. When they returned to the car, they told Havner that the supplier had stolen the money. Because of Barcomb's deception, Shook, Tuttle, Crawford, and Havner eventually were forced to return to Loucks' home without either the money or the drugs.
While the teenagers were gone, Pearce and Loucks learned by telephone that the money had been stolen. Pearce became very angry and was standing outside with a gun visibly tucked in his pants when they returned shortly thereafter. As Shook, Tuttle, Crawford and Havner exited the car, Pearce waved the gun and ordered them inside the office of Loucks' business. Loucks and the four teenagers remained confined there by Pearce for an unknown period of time, during which Pearce's mood swung between calm and threatening. Pearce refused to allow anyone to leave and, at various times, waved his gun. At one point, he grabbed Havner by the throat and slammed her head against a wall. At another, he took Tuttle outside and forced him at gunpoint to perform oral sex upon him.
Eventually, Pearce allowed Havner to leave. Around that time, Pearce also called a friend, Theodore Butterfield, and asked Butterfield to bring Smith, the defendant in this case, and come to Loucks' home. Many neighbors were at the house where Butterfield received the call, including Heath Brittingham, who agreed to join Butterfield. When Smith, Butterfield and Brittingham arrived, they were visibly armed, and Smith stated, "We're here to do business." According to Tuttle, Pearce then spoke with these three men outside. Brittingham also testified that Pearce and Smith spoke to each other at a distance from Brittingham, so that he did not hear what was said. At some point, Pearce told the three men that Tuttle and Crawford were going to show them where to find the people who stole Pearce's money. Pearce, still holding his gun, then told Tuttle and Crawford to get in his car. Loucks refused to allow Pearce to take his step-son, Shook, as well. Loucks offered to drive Tuttle and Crawford, who had arrived in Havner's car, to their homes and to get Pearce the money in the morning. Pearce refused, but told Loucks he was not going to hurt the boysonly take them down the road, punch them in the mouth, and make them walk home. Pearce instructed Loucks to wait by the phone to hear from the boys.
Pearce, Smith, Butterfield, Brittingham, Tuttle and Crawford left in Pearce's car, a two-door trans am with T-tops. Pearce drove and Smith sat in the front passenger seat. In the back, Tuttle sat on Crawford's lap in the middle, while Butterfield and Brittingham sat on either side of the boys. After driving a short time, Pearce turned in the wrong direction for traveling to Barcomb's location. He drove a short distance more and performed a U-turn.
*55 According to Butterfield's testimony, sometime during this drive Smith told Pearce that his 9 mm pistol jammed and the two exchanged guns, with Smith receiving Pearce's functional .40 caliber pistol. Brittingham also testified that Pearce and Smith exchanged guns during this trip.
Pearce stopped the car along the side of the road and told Tuttle to get out of the car. Smith first exited from the passenger's side and stood between the door and the car while Tuttle crawled over Brittingham from the middle of the backseat and out the passenger's side. Pearce told Smith to "Pop him in the f___ing jaw," to which Smith replied, "F___ that." Smith then turned around and shot Tuttle once in the back of the head. When Smith got back in the car, Pearce asked, "Is he dead?," and Smith replied, "Yeah, he's dead. I shot him in the head with a f___ ing .40." Pearce then drove approximately two hundred yards further, stopped the car, and Smith again exited the vehicle. Pearce ordered Crawford out. Crawford complied while pleading, "Don't. Please don't." Smith shot Crawford once in the head, Crawford fell, and Smith shot him a second time in the chest.
After leaving the scene, Smith threatened to kill Butterfield and Brittingham if they snitched. Pearce drove to a restaurant where he and Smith ate. Pearce and Smith then left Butterfield and Brittingham at a grocery store, telling them not to leave. They returned approximately forty minutes to an hour later. They drove to a bridge, where Smith wrapped the .40 caliber pistol in newspaper and threw it in the water. Shortly thereafter they split ways, and Smith attempted to leave town by bus but was unable to do so because of an approaching hurricane.
Remarkably, Tuttle survived the gunshot to his head. At trial, he testified that he remembered getting out of the car, then everything went black, and his next memory was waking up on the side of the road. He felt the hole in his head, but did not remember being shot or who shot him. He eventually flagged down assistance. Crawford, however, died at the scene.
The entire course of these events occurred during the evening of September 13, and into the morning of September 14, 1999. That morning, Butterfield and Brittingham were located and interviewed by police. Smith was arrested on the same day, and Pearce was located and arrested a couple of weeks later. The murder weapon, Pearce's .40 caliber pistol, was recovered from the location in Tampa Bay where Butterfield testified Smith had thrown it, and the bullets found in Tuttle and Crawford were matched to the same pistol.
Smith and Pearce were charged as codefendants and tried separately. Butterfield and Brittingham served as State witnesses. At trial, the defense's theory was that although Smith was present in the car, Pearce was the shooter, possibly through the T-top opening in the car, and that Butterfield and Brittingham's testimonies were designed to cover for Pearce by naming Smith as the shooter. On May 3, 2001, a jury convicted Smith of the attempted first-degree murder of Tuttle and the first-degree murder of Crawford. Following the penalty phase, the jury advised a sentence of death by eight to four. The trial court sentenced Smith to life imprisonment for the attempted murder of Tuttle and to death for Crawford's murder. The trial court found three aggravating factors (Smith was previously convicted of a felony involving the use of violencethe contemporaneous attempted murder; the offense was committed in a cold, calculated, and premeditated manner (CCP) without any pretense of moral or legal justification; *56 and the offense was committed while Smith was engaged, or was an accomplice, in the commission of kidnaping) and five nonstatutory mitigating factors (loss of fathervery little weight; brother's illnessvery little weight; support of familyvery little weight; good student as a childlittle weight; history of drug abuse-little weight).
Smith now appeals his convictions and sentence of death and raises seven issues.[1]

II. ANALYSIS

A. Motion for Mistrial Based on Statement that Witness Butterfield Testified Was Made by Defendant
The two key witnesses to the actual shootings of Tuttle and Crawford were Butterfield and Brittingham. In opening statements, defense counsel told the jury that the case against Smith "rests solely on the testimony and credibilityor I suggest to you, the lack of credibilityof Teddy Butterfield and Heath Brittingham," and that these two witnesses "are covering up from day one for Faunce Pearce." Of the two witnesses, Butterfield was called first. After testifying to what he witnessed leading to the shooting, the following testimony was given:
Q. And how far did you driveor how far did Mr. Pearce drive?
A. He drove probably two miles or sotwo or threedid a U-turn, pulled over on the side of the road, and told the kidthe first one thatI guess the guy that got ripped off, or the one he handed his money toto get out of the car. And then, at which time Joey had to get out of the car to let him out, because he was in the passenger seat.
Faunce toldFaunce told Joey to break his jaw for getting his money ripped off. And after that, you heard a gunshot.
Q. Did you actually see what happened?
A. No, sir. You couldn't see nothing.
Q. Was Lawrence Joey Smith the person that was out of the car?
A. Yes, sir.
Q. Faunce Pearce ever get out of that car?
A No, sir.
Q. Was he in the driver's seat?
A. Yes, sir.
Q. Joey Smith shot Steve Tuttle?
A. From hisfrom all the witnessesfrom all the proof that's been going around, I
At this point, there was an objection on the basis of speculation and leading. The court directed the prosecutor not to lead the witness but stated he had not granted the objection. Then, the testimony resumed:
Q. All right. Who got out of the car?
*57 A. Joey.
Q. Did you hear a gunshot?
A. Yes, sir.
Q. Did you see Steve Tuttle fall?
A. No, sir.
Q. What's the next thing that happened?
A. Joey got back in the car, pulled up a couple hundred yards, and got back out of the car. And Faunce told the other kid to get out of the car.
He got out of the car, and Joey when he got out of the car, he stepped around the other side of the car door, and I seen two shots go off.
Q. You saw two shots go off?
A. Yes.
Q. What did you see?
A. That's it. It was dark. Couldn't see nothing. Didn't see nobody get shot or nothing. Just seen theI heard the two shots.
Q. Did you see a muzzle flash?
A. No, sir. Well, you could see the fire flash from the pistol.
Q. That's what I am talking about.
A. Yes, sir.
Q. Did you hear Lawrence Joey Smith make any statements to Mr. Pearce?
A. I heardFaunce had said something about "dead," or something. I didn't hear exactly what he said.
Here, the defense raised an objection on the ground of hearsay. The court denied the objection, and the testimony continued.
Q. Are you sure, or are you not?
A. I couldn't hear exactly what was said, but when Joey had got back in the car
The defense again objected at this point on the basis of speculation, and the court stated that the objection was noted. Butterfield then continued his answer:
A. When Joey got back in the car, he had made a statement that that was the 13th or 14th people that had beenthat he had shot.
At this point defense counsel objected and asked to approach the bench, which was granted. At the bench, counsel argued that the statement which just had been testified to was irrelevant and prejudicial, and a motion for mistrial was made. In response, the court stated, "I will deny it. The Court specifically finds it was part of the testimony." The testimony then resumed.
Q. On the second occasion, did Faunce Pearce ever get out of the vehicle?
A. No, sir.
Thereafter, the testimony moved into what occurred after the shootings.
Later, during cross-examination of Butterfield by defense counsel, the following colloquy occurred:
Q. Now, you could not see any shooting; is that correct? Is that your testimony?
A. Yes, sir.
Q. And you said that when Mr. Smith got back in the car, he made some comment?
A. Yes, sir.
Q. Well, do you remember me taking your deposition on March 26th, 2001?
A. Yes, sir.
Q. And do you remember the followingthat you were sworn under oath, at that time, correct?
A. Yes, sir.
Q. And beginning on Page 21, Line 3:
"Question: Nobody said anything at all to him?
"Answer: Nothing was said, no, sir.

*58 "Question: You didn't hear anything said by anybody?
"Answer: No, sir."
Do you remember those questions and answers?
A. Yes, sir.
Q. And then further, do you remember the following questions and answers, again on Page 21:
"Question: After the second one had gotten out and you heard the two gunshots, when Joey got back in the car, did you hear any conversation between him and Faunce Pearce or anybody?
"Answer: No, sir.
"Question: Heath didn't say anything?
"Answer: No, sir."
Do you remember that?
A. Yes, sir.
Thereafter, the testimony moved to another subject, and there was no further testimony by Butterfield concerning statements made by Smith.
Smith argues that the trial court abused its discretion in denying Smith's motion for mistrial after Butterfield testified that Smith had said "that was the 13th or 14th people that had beenthat he had shot." Smith asserts that the testimony was irrelevant, went only to proving bad character, and its undue prejudicial effects outweighed any probative value, as the alleged statement impermissibly went toward proving propensity to commit violent crimes. For support, Smith cites Jackson v. State, 451 So.2d 458 (Fla.1984), and Delgado v. State, 573 So.2d 83 (Fla. 2d DCA 1990), in which error was found in the admission of the defendants' statements boasting of prior crimes. Though agreeing that the statement was not repeated again at trial and that the State's permissible evidence of guilt was strong, Smith argues that the statement was a substantial part of the State's case and must have had a substantial impact upon the jury, thereby making its admission harmful error.
In response, the State asserts that the denial of the motion for mistrial was not an abuse of discretion because the testimony was evidence of Smith's state of mind during the crime and was not offered to prove that Smith had actually killed thirteen or fourteen people or to show criminal propensity. The State argues the statement was inculpatory regarding the charged crime and relevant to proving intent and guilty knowledge. For support, the State cites two cases holding that evidence relevant to state of mind is admissible. See Stephens v. State, 787 So.2d 747 (Fla.2001); Coolen v. State, 696 So.2d 738 (Fla.1997). Further, the State distinguishes those cases cited by Smith because the statements addressed therein were not made during the commission of the charged crime and did not involve an affirmation of guilt regarding the charged crime. Finally, the State asserts that even if this Court should find that the admission of the testimony was error, it was harmless and "not so prejudicial as to require reversal," Cole v. State, 701 So.2d 845, 853 (Fla.1997), given that other admissible evidence included several eyewitnesses and the challenged testimony was an isolated and inadvertent reference amidst numerous inculpatory statements.
We begin our analysis by noting that this issue comes to us as an appeal of the denial of Smith's motion for mistrial. An order granting mistrial is required only when the error upon which it rests is so prejudicial as to vitiate the entire trial, Overton v. State, 801 So.2d 877, 898 (Fla. 2001), making a mistrial necessary to ensure that the defendant receives a fair trial, Cole, 701 So.2d at 853. This Court *59 reviews a trial court's ruling on a motion for mistrial under an abuse-of-discretion standard of review. Id.
We note that Smith correctly does not assert that this evidence was admitted in violation of section 90.404(2)(c)(1), Florida Statutes (2001).[2] The record does not reflect that the State intended to introduce this evidence as similar fact evidence of other crimes, wrongs, or acts under section 90.404(2)(a). There is nothing in the present record to indicate that the State even knew that this witness would give this testimony; as is seen in the cross-examination, the witness did not testify to this statement in his deposition.[3] Smith's claim is thus not that the denial of the motion for mistrial was error because there was an express violation of section 90.404(2). Rather, Smith's claim is that the denial conflicted with this Court's prior cases that recognize prejudicial error in the admission of testimony of "the kind forbidden by the Williams rule[4] and section 90.404(2)." Jackson, 451 So.2d at 461.
However, we find that the issue in the present case is unlike the issue that was before this Court in Jackson. In Jackson, the issue concerned a State witness's testimony that came expressly within section 90.404(2)(a). After setting out the facts of the two murders for which Jackson was tried, this Court described the Williams rule issue presented therein:
The first issue urged in the guilt phase concerns testimony from Sylvester Dumas, a state witness. During direct examination by the state, Dumas testified about an occasion when Jackson had pointed a gun at him and boasted of being a "thoroughbred killer" from Detroit. Jackson's defense counsel interrupted the testimony to object to the line of questioning on relevancy grounds, and was overruled. Jackson argues that the testimony had no valid probative value and only tended to show bad character or propensity, and therefore is inadmissible. § 90.404(2)(a), Fla. Stat. (1979); Drake v. State, 400 So.2d 1217 (Fla.1981); Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959).
Jackson, 451 So.2d at 460 (footnote omitted). In footnote one of the Jackson opinion, the exact testimony to which this issue referred was set out. That testimony revealed that the objectedto statement regarding being a "thoroughbred killer" was made on a wholly different occasion than when the two murders occurred. We, therefore, agreed with Jackson that the testimony was impermissible and prejudicial. Id. at 461; see also Delgado, 573 So.2d at 84-85 (finding error in admission of testimony that defendant had stated that he had killed ten men, where statement was made prior to charged crime, at a time when defendant had no intent to *60 commit charged crime, and in a context unrelated to charged crime). In contrast, here Butterfield testified that the statement at issue was made by Smith during the criminal episode. It was part of what this witness testified to observing and hearing immediately after the shooting of Crawford.
Significantly, the defense theory in this case was that Smith did not shoot Tuttle or Crawford. In the opening statement, defense counsel told the jury:
But many of the facts that you have also heard [the prosecutor] say are not true.... Mr. Lawrence Joey Smith was not the shooter in this case. He did not shoot Robert Crawford, nor did he shoot Stephen Tuttle. Mr. Lawrence Joey Smith was not involved in this shooting whatsoever. He had no prior knowledge that this was going to take place, and he participated in no fashion and had nothing to do with any planning of the shooting of Mr. Tuttle or Mr. Crawford.
The actual shooter in this case, the killer in this case, is Faunce Pearce.
From this we see that the identity of Smith as the shooter was a crucial issue at the trial. Tuttle, the attempted murder victim, testified that when he was told to get out of the car, he exited through the passenger-side door, which means that Smith, who was in the front passenger seat of the two-door vehicle, had to let him out. Indeed, Tuttle testified that he exited the car between Smith and the passenger-side door. Tuttle, however, was unable to testify as to who shot him, as he could only remember exiting and then blacking out. Furthermore, Butterfield testified that he did not see the actual shots fired because it was too dark out. But Brittingham testified that he did see Smith fire the shots at both Tuttle and Crawford. As noted above, the defense told the jury that the case against Smith rested solely upon the credibility of Butterfield and Brittingham. Therefore, the admission by Smith contained within the statement that Butterfield testified was made immediately after the shooting of Crawford, "that that was the 13th or 14th people that he had shot," (emphasis added) was relevant to the identity of the shooter, as well as being inextricably intertwined with the criminal episode as related through Butterfield.
Smith cites to Bryan v. State, 533 So.2d 744 (Fla.1988), in contending that the trial court erroneously relied upon the concept of res gestae when concluding that the statement "was part of the testimony." However, while Smith is correct that this Court criticized the use of the term res gestae in Bryan, we also made clear in that decision that the issue in respect to other crimes evidence is relevancy. Specifically, we stated:
The requirement that similar fact crimes contain similar facts to the charged crime is based on the requirement to show relevancy. This does not bar the introduction of evidence of other crimes which are factually dissimilar to the charged crime if the evidence of other crimes is relevant. As we pointed out in Williams:

Let us begin with a reminder that we here deal with so-called similar fact evidence which tends to reveal the commission of a collateral crime. Our initial premise is the general canon of evidence that any fact relevant to prove a fact in issue is admissible into evidence unless its admissibility is precluded by some specific rule of exclusion. Viewing the problem at hand from this perspective, we begin by thinking in terms of a rule of admissibility as contrasted to a rule of exclusion. With regard to similar fact evidence, illustrated by that in the case at bar, those who would exclude it *61 invoke the principles of undue prejudice, collateral issues and immateriality. In so doing it appears to us that they disregard the basic principle of the admissibility of all relevant evidence having probative value in establishing a material issue.
. . . .
It will be seen that early in the history of the development of this rule in Florida, this court committed itself to the concept that all relevant evidence having probative value is admissible save to attack character even though it would have a tendency to suggest the commission of a separate crime. Killins v. State, 28 Fla. 313, 9 So. 711, and Langford v. State, 33 Fla. 233, 14 So. 815. Another often cited early decision is Wallace v. State, 41 Fla. 547, 26 So. 713, 718. Here again, citing as authority among other cases State v. Lapage, 57 N.H. 245, and Makin v. Attorney General of New South Wales, supra, this court stated its position to be that proof of any fact with its circumstances even though amounting to a distinct crime is admissible if it has "some relevant bearing upon the issue being tried". Once more we find relevancy to be the test of admissibility. If the proffered evidence is relevant to a material fact in issue, it is admissible even though it points also to a separate crime.

Williams, 110 So.2d at 658, 660 (emphasis in original). The only limitations to the rule of relevancy are that the state should not be permitted to make the evidence of other crimes the feature of the trial or to introduce the evidence solely for the purpose of showing bad character or propensity, in which event it would not be relevant, and such evidence, even if relevant, should not be admitted if its probative value is substantially outweighed by undue prejudice. Our later case law reiterates the controlling importance of relevancy. In Randolph v. State, 463 So.2d 186, 189 (Fla.1984), cert. denied, 473 U.S. 907, 105 S.Ct. 3533, 87 L.Ed.2d 656 (1985), we reexamined Williams and stated:
In that case the Court laid down the test of the admissibility of such evidence as being one of relevancy. Even if the evidence in question tends to reveal the commission of a collateral crime, it is admissible if found to be relevant for any purpose save that of showing bad character or propensity.
In Ruffin v. State, 397 So.2d 277 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981), we rejected the argument that such evidence must be necessary, not merely relevant.
In Williams v. State, we announced a broad rule of admissibility based upon relevancy. Necessity has never been established by this Court as an essential requisite to admissibility. In Williams, we declared that any fact relevant to prove a fact in issue is admissible into evidence even though it points to a separate crime unless its admissibility is precluded by a specific rule of exclusion.

Ruffin, 397 So.2d at 279-80. Similarly, in Ashley v. State, 265 So.2d 685, 694 (Fla.1972), we held:
So long as evidence of other crimes is relevant for any purpose the fact that it is prejudicial does not make it inadmissible. All evidence that points to a defendant's commission of a crime is prejudicial. The true test is relevancy.
Bryan, 533 So.2d at 746-47.
In Coolen v. State, 696 So.2d 738 (Fla. 1997), we likewise made the point that the test was relevancy when the issue presented *62 concerned references to previous criminal convictions and prison sentences:
During a taped interview at the sheriff's office, Coolen made several references to his previous criminal convictions and prison sentences. Defense counsel filed a motion to redact Coolen's taped statement so that the jury would not hear about his criminal record. While the court recognized that evidence of a prior criminal record is inadmissible to show bad character or propensity to commit crimes, the court determined that the statements were relevant here to show Coolen's state of mind during the attack. Thus, the court denied the motion to excise the tape and admitted the confession in its entirety.
We agree with the trial court that these statements were properly admitted to explain Coolen's state of mind at the time of the offense. Coolen stated that Kellar had "something silver in his hand." Coolen reacted quickly by stabbing Kellar because his previous "eight years in maximum prisons up in Massachusetts" had taught him not to take chances, to "react very quickly," and that it's better to "be safe than sorry." Thus, these statements were relevant to explain Coolen's actions and state of mind at the time of the stabbing.
In his third claim, Coolen contends that the knife threat to Jamie Caughman constituted "collateral crimes" evidence that was being introduced to show his propensity to confront people with a knife. Thus, he argues, testimony relating to this incident was inadmissible under section 90.404, Florida Statutes (1993). However, subsections 90.404(1) and 90.404(2) do not govern the admissibility of this evidence. As this Court explained in Griffin v. State,

evidence of uncharged crimes which are inseparable from the crime charged, or evidence which is inextricably intertwined with the crime charged, is not Williams rule evidence. It is admissible under section 90.402 because "it is a relevant and inseparable part of the act which is in issue.... [I]t is necessary to admit the evidence to adequately describe the deed."
639 So.2d 966, 968 (Fla.1994) (quoting Charles W. Ehrhardt, Florida Evidence § 404.17 (1993 ed.)), cert. denied, 514 U.S. 1005, 115 S.Ct. 1317, 131 L.Ed.2d 198 (1995).
In the instant case, Jamie Caughman's testimony does not fall within the Williams rule and was not introduced by the State as similar fact evidence. Nor was this testimony's sole relevance to prove Coolen's bad character. Instead, the testimony was necessary to establish the entire context out of which the crime arose. Jamie Caughman's testimony was relevant and was not unduly prejudicial. Therefore, we find no error in the admission of this testimony.
Coolen, 696 So.2d at 742-43 (footnotes omitted). Just as the evidence in Coolen was relevant to a material issue, "state of mind," the admission by Smith here was relevant to the identity of Smith as the shooter.
Furthermore, the admission by Smith was inextricably intertwined with the crime. See Griffin v. State, 639 So.2d 966, 968 (Fla.1994) (noting evidence of uncharged crimes which are inseparable from crime charged and evidence which is inextricably intertwined with the crime charged are not Williams rule evidence but, rather, are admissible under section 90.402). In Tumulty v. State, 489 So.2d 150 (Fla. 4th DCA 1986), approved by Padilla v. State, 618 So.2d 165 (Fla.1993), the court adopted the following from Professor Charles W. Erhardt:

*63 Professor Ehrhardt discusses "inseparable crime" evidence and the characteristics distinguishing it from "Williams Rule" evidence in his work on Florida Evidence (2d ed.1984):
[T]he Florida opinions have not contained a close analysis of the reasons that inseparable crime evidence is admissible. Professor Wigmore suggests that this evidence is not admitted either because it shows the commission of other crimes or because it bears on character, but rather because it is a relevant and inseparable part of the act which is in issue. This evidence is admitted for the same reason as other evidence which is a part of the so-called "res gestae"; it is necessary to admit the evidence to adequately describe the deed. In addition to Wigmore's logical argument, it seems that both the language of Section 90.404(2)(a) and of Williams indicates that the rule applies to evidence of discrete acts other than the actions of the defendant committing the instant crime charged. Under this view, inseparable crime evidence is admissible under Section 90.402 because it is relevant rather than being admitted under 90.402(2)(a). Therefore, there is no need to comply with the ten-day notice provision. The Wigmore view has been adopted by the United States Court of Appeals for the Fifth and Eleventh Circuits.
Tumulty, 489 So.2d at 153 (footnote omitted). We conclude that these principles apply here as well.
Finally, in response to Smith's argument that the statement was a substantial part of the State's case, we note that in Bryan, we made the point that the State should not be permitted to make the evidence of other crimes the feature of a trial. Our review of the record indicates that the statement at issue here was not made a feature of this trial. Though a similar statement had been testified to by Brittingham in deposition, he did not testify to it at trial. Further, the statement was not referred to again in closing argument.
B. Motion for Mistrial Regarding Prosecutor's Slamming of Gun Down on Defense Counsel Table During Closing Argument
During closing argument, the prosecutor displayed the murder weapon and, in a line of argument about the trajectories of the bullets that killed Crawford, stated:
Use your common sense. The car is off the ground to begin with. [Pearce has] got to stand up to get over the top of the car, over the windshield, and he has to shoot over there (indicating). The bullet would be going down. And from his location, how could he be right on top to shoot straight through? Physically impossible.
Did [Pearce] want him dead? Absolutely. Did [Pearce] shoot him? No.
So, where does the gun go, folks?
(Indicating.) It goes right there.
He then slammed the gun on the defense table. Defense counsel objected and moved for mistrial, arguing that the demonstration was improper and prejudicial. A second defense counsel described the sound made as "[l]ouder than a gunshot." The trial court denied the motion but admonished the prosecutor to not repeat the action. On appeal to this Court, Smith argues that he is entitled to a new trial because the trial court erroneously denied his motion for mistrial. Smith asserts that the prosecutor's action prejudiced his defense by injecting fear and emotion into the jury's consideration of the case.
*64 A trial court's ruling on a motion for mistrial is within the sound discretion of the trial court and will be sustained on review absent an abuse of discretion. Ford v. State, 802 So.2d 1121, 1129 (Fla. 2001). The control of prosecutorial comments and conduct in closing argument is also within the trial court's discretion and also will not be disturbed absent a clear showing of abuse. Esty v. State, 642 So.2d 1074, 1079 (Fla.1994). In respect to claims such as this, we respect the vantage point of the trial court, being present in the courtroom, over our reading of a cold record. See Justus v. State, 438 So.2d 358, 366 (Fla.1983). We find no error in the trial court's admonishment of the prosecutor and denial of the motion for new trial.

C. Lack of Record of Venire's Oath
Florida Rule of Criminal Procedure 3.300(a) states that "[t]he prospective jurors shall be sworn collectively or individually, as the court may decide." The trial record below does not indicate whether the prospective jurors in this case were sworn prior to voir dire. Rather, it begins with the judge's opening remarks and proceeds directly into voir dire. In this appeal, Smith does not contend that the venire was unsworn or that rule 3.300 was violated but claims that a new trial is necessitated by the mere absence of a record of the venire's oath. Smith, however, raised no objections at trial regarding this issue.
As the appellant, Smith has the burden of bringing forth an adequate record to support his appeal. Smith has not provided an adequate record for this Court to determine whether or not the venire was unsworn. As the Second District Court of Appeal noted in Pena v. State, 829 So.2d 289, 294 (Fla. 2d DCA 2002), review granted, No. SC02-2411 (Fla. May 8, 2003), where an appellant neither alleges nor proves by post-trial motions or affidavits that the venire was unsworn, an appellate court is "not required to decide whether it would be fundamental error to conduct a trial with members of a venire that had not been sworn." Where, as here, there is simply no record one way or the other, no error, let alone fundamental error, has been shown. See id.; see also United States v. Pinero, 948 F.2d 698, 700 (11th Cir.1991) (concluding mere absence of record does not establish that jury was unsworn; thus, challenge involved issue of fact not appropriately raised on appeal); Hobbs v. State, 121 Tenn. 413, 118 S.W. 262, 262 (1908) (holding presumption of regularity of judicial proceedings not overcome by absence of record that jury was sworn).

D. Instruction Upon and Finding of CCP Aggravating Factor
The trial court instructed the jury on the CCP aggravating factor and found that factor was established. Smith claims that the trial court erred on both points. We disagree. As we stated in Ford v. State, 802 So.2d 1121 (Fla.2001):
A trial court may give a requested jury instruction on an aggravating circumstance if the evidence adduced at trial is legally sufficient to support a finding of that aggravating circumstance. A trial court's ruling on an aggravating circumstance is a mixed question of law and fact and will be sustained on review as long as the court applied the right rule of law and its ruling is supported by competent substantial evidence in the record.
Id. at 1133 (footnote omitted). Smith does not contest that the trial court applied the right rule of law. Rather, he contends that there was not competent, substantial evidence to support the element of CCP that requires "a careful plan or prearranged *65 design to kill," Rogers v. State, 511 So.2d 526, 533 (Fla.1987), and that CCP is founded upon circumstantial evidence which is not inconsistent with a reasonable hypothesis that there was no CCP. However, in its detailed sentencing order, the trial court set forth the evidence supporting each of the elements of CCP, including that Smith had a careful plan or prearranged design to kill. Our reading of the record demonstrates that there was competent, substantial evidence to support this element consistent with our case law.
Smith, in advance of arriving at Loucks' home, had procured and brought with him a handgun. Upon his arrival, Smith said, "We're here to do business." When leaving Loucks' home, Smith got into the front passenger seat of the two-door car, which contained Butterfield and Brittingham armed in the back and Tuttle and Crawford sitting between them. Smith traded guns with Pearce during a trip of several miles at night into a rural, unlighted area, stating that he needed to trade guns because the one he was carrying would jam. When Pearce stopped the vehicle on the shoulder of the road in darkness, Smith got out of the car. Pearce told Tuttle to exit the car and said to Smith, "Pop him in the f___ing jaw," to which Smith replied, "F that." Immediately thereafter, Smith shot Tuttle in the back of the head. When Smith got back in the car, Pearce asked him, "Is he dead?," to which Smith replied, "Yeah, he's dead. I shot him in the head with a f___ing .40." Pearce then drove the car 200 yards and stopped again. Crawford was made to get out through the passenger-side door, and Smith shot him in the back. Crawford dropped to the ground, and Smith fired a second shot into him.
Clearly, regarding this shooting of Crawford, there was sufficient evidence to support CCP. Indeed, this case is analogous to Walls v. State, 641 So.2d 381 (Fla. 1994), in which this Court found, in respect to there being evidence of "a careful plan or prearranged design" to commit murder before the fatal incident, that CCP was supported in the shooting of a second victim:
Walls left his first victim, weapon in hand, then returned to the place where he had left Peterson bound and gagged, then taunted and abused her before shooting her to death. At the point where Walls left [the first victim's] body, he obviously had formed a "prearranged design" to kill Peterson, a conclusion only reinforced by the time it took for him to kill her....
Id. at 388; see also Asay v. State, 580 So.2d 610, 613 (Fla.1991) (finding sufficient evidence for CCP and concluding decision to kill was not impulsive where defendant shot second victim twenty minutes after shooting first victim); Alston v. State, 723 So.2d 148 (Fla.1998) (finding no error in finding CCP where defendant had opportunity to leave the crime scene and not commit the murder but, rather, acted out the plan he conceived during the period in which the events occurred).
We therefore find no error in giving the CCP instruction or in finding the CCP aggravating factor in this case.

E. Statements Regarding Penalty Phase Deliberations

1. Prosecutor's Statements
In Smith's fourth point on appeal, he argues that the prosecutor misled both the jury and the trial court about the correct rule of law regarding penalty-phase deliberations. Smith alleges that the prosecutor's statements were contrary to Florida law that "a jury is neither compelled nor required to recommend death where aggravating factors outweigh mitigating factors." *66 Henyard v. State, 689 So.2d 239, 249-50 (Fla.1996).
During voir dire, the prosecutor stated to the prospective jurors:
Here's the situation. You found the existence of an aggravated circumstance or circumstances proven beyond a reasonable doubt. You found that that aggravating circumstance or circumstances justify the imposition of the death penalty. You go back to the evidence, you look to mitigating circumstances. If you find that there are no mitigating circumstances, your job is over. Your recommendation to the Court is the verdict of death.

If, however, after reviewing the evidence, you find the existence of mitigating circumstances, then the weighing process begins. And this is not a numbers game. It's not, "Well, there's three aggravators over here, and four mitigators over here. Four versus three, four wins." It's not like that. It's a weighing situation. If you find, based upon this weighing situation that the aggravating circumstances outweigh the mitigating circumstances, then your recommendation to the Court is one of death. If you find that the aggravating circumstances are outweighed by the mitigating circumstances, then your recommendation to the Court is one of life.
(Emphasis added.) Also, during the penalty-phase closing arguments, the prosecutor stated:
If you find no mitigating factors ... then your obligation is to return a verdict to the judge recommending a sentence of death.
If [you find mitigation], then your responsibility becomes one of weighing the factors against one another. If your deliberation leads to the conclusion that the mitigating factors outweigh the aggravating factors, your recommendation to the Court should be that Joey Smith live.
If you find, to the contrary, that the aggravating factors outweigh the mitigating factors, then your recommendation to the Court will be that Joey Smith die.
(Emphasis added.) No contemporaneous objection was made by the defense to these comments. Therefore, we can address this issue as it relates to the jury's verdict only under the fundamental error doctrine, which requires the type of "error that `reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.'" Urbin v. State, 714 So.2d 411, 418 n. 8 (Fla.1998) (quoting Kilgore v. State, 688 So.2d 895, 898 (Fla.1996)); see also Chandler v. State, 702 So.2d 186, 191 n. 5 (Fla. 1997) (describing fundamental error as error which is "so prejudicial as to vitiate the entire trial").
This Court has held that comments indicating to the jury that they "must" or are "required" to recommend the death penalty when aggravating factors outweigh mitigating factors are erroneous misstatements of the law. See Cox v. State, 819 So.2d 705, 717-18 (Fla.2002); Franqui v. State, 804 So.2d 1185, 1192-93 (Fla.2001); Brooks v. State, 762 So.2d 879, 902 (Fla.2000); Henyard, 689 So.2d at 249-50. We note that in this case the trial court correctly recited all standard jury instructions, defense counsel informed the jury that "the law never requires the death penalty under any circumstances," and the prosecutor himself told the jury that the judge's instructions should be relied upon over any statements of law by the attorneys. We therefore conclude that neither prejudicial nor fundamental error resulted *67 from these statements by the prosecutor to the jury.

2. Trial Court's Order
In his sentencing order, the trial judge set forth the aggravating and mitigating factors found, the mitigating factors rejected, and the factual basis for those findings. That order concludes with the following paragraphs:
In weighing and comparing the aggravating and mitigating factors discussed above, this Court concludes that beyond and to the exclusion of all reasonable doubt Defendant killed Robert Crawford with a firearm in a cold, calculated and premeditated manner while assisting in the kidnapping of Robert Crawford and after having tried to kill Stephen Tuttle with a firearm, and that Defendant was a close friend of Faunce Pearce but not dominated by him, was saddened by the long illness of his father, had a loving, caring family, had a very good childhood, and had a long history of drug abuse. The aggravating factors far outweigh the mitigating factors and as such requires that the appropriate punishment in this case is death.
Death is never a pleasant or easy resolution to any criminal conduct, and this Court is deeply saddened that death must even be considered. However, the Legislature of this state has required that death must be imposed when the aggravating factors far outweigh the mitigating factors, and this Court must be guided by this law. Ours is a country of law, not men, and the law of this state requires the result to be rendered hereafter.

State v. Smith, No. 99-3110CFAES, order at 31 (Fla. 6th Cir. Ct. order filed Aug. 17, 2001) (sentencing order) (emphasis added). We agree with Smith that this language in the sentencing order is an incorrect statement of law. This Court stated in Alvord v. State, 322 So.2d 533 (Fla.1975):
[Florida's death penalty] statute contemplates that the trial jury, the trial judge and this Court will exercise reasoned judgment as to what factual situations require the imposition of death and which factual situations can be satisfied by life imprisonment in light of the totality of the circumstances present in the evidence. Certain factual situations may warrant the infliction of capital punishment, but, nevertheless, would not prevent either the trial jury, the trial judge, or this Court from exercising reasoned judgment in reducing the sentence to life imprisonment.
Id. at 540. Thus, the trial court's statement that the law "required" the imposition of the death penalty was erroneous. Because it is not evident to this Court whether the trial court simply misstated the law or would have considered imposing a sentence of life imprisonment if he thought it permitted and thus misapplied the law, we remand this case for resentencing by the trial court. Upon resentencing, the trial court shall again carefully consider the trial record and hold a hearing in accord with Jackson v. State, 767 So.2d 1156, 1160-61 (Fla.2000).

F. Unproven Statement in Sentencing Order
We agree with Smith that the latter portion of the following statement quoted by the trial court in its sentencing order, referencing "Billy the Kid," is not part of Smith's trial record:
d. After the killing, the Defendant announced to the people in the automobile: "That's twelve and thirteen, eight more to go and I'll match Billy the Kid."
However, since we are remanding for a resentencing before the trial judge, we believe that the remainder of this issue is *68 moot. The trial court, upon resentencing, shall again carefully consider the trial record and hold a hearing in accord with Jackson v. State, 767 So.2d 1156, 1160-61 (Fla.2000).

G. Constitutionality of Florida's Death Penalty Statute
Smith asserts that Florida's capital sentencing scheme violates the United States Constitution under the holding of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court addressed a similar contention in Chavez v. State, 832 So.2d 730, 767 (Fla.2002), cert. denied, ___ U.S. ___, 123 S.Ct. 2617, 156 L.Ed.2d 637 (2003), and denied relief. We find that Smith is not entitled to relief on this claim. We specifically note that one of the aggravating factors present in this matter is a prior violent felony conviction.

III. CONCLUSION
Accordingly, for the reasons stated in this opinion, we affirm Smith's convictions for first-degree murder and attempted first-degree murder, and the sentence of life imprisonment for the latter. We remand this case to the circuit court for resentencing by the trial court for the first-degree murder conviction.
It is so ordered.
WELLS, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
PARIENTE, J., concurs in part and dissents in part with an opinion, in which ANSTEAD, C.J., concurs.
PARIENTE, J., concurring in part and dissenting in part.
Although I concur in the affirmance of Smith's convictions, I would reverse the death sentence and remand for a new penalty phase based on the erroneous admission during the guilt phase of improper and prejudicial collateral crime evidence State witness Butterfield's testimony that after Smith shot the two victims in this case, he bragged that they were "the 13th or 14th people that had beenthat he had shot."
The majority's view that the remark was relevant as an admission of guilt, and therefore not subject to scrutiny under the Williams rule, does not give proper consideration to the fact that the admission encompassed many other crimes irrelevant to this case. Thus, it must be analyzed under case law interpreting both sections 90.403 and 90.404, Florida Statutes (2001). The majority chooses not to analyze the remark under section 90.404, see majority op. at 13-15, and also fails to perform a section 90.403 balancing test, which would lead to a conclusion that this statement had negligible probative value that was far outweighed by the danger of unfair prejudice.
An additional concern is that the majority approves the admission of the evidence on grounds not relied on by the trial judge, who merely stated, in response to the motion for mistrial and without soliciting a response from the State, that the remark was "part of the testimony." There are significant reasons in this case, as there were in Robertson v. State, 829 So.2d 901 (Fla.2002), for not applying the "tipsy coachman" rule to the admission of evidence pointing to the defendant's commission of collateral crimes. We stated in Robertson:
The key to the application of this doctrine of appellate efficiency is that there must have been support for the alternative theory or principle of law in the record before the trial court....
. . . .
... Before admitting Williams rule evidence, it is incumbent upon the trial *69 court to make multiple determinations, including whether the defendant committed the prior crime, whether the prior crime meets the similarity requirements necessary to be relevant as set forth in our prior case law, whether the prior crime is too remote so as to diminish its relevance, and finally, whether the prejudicial effect of the prior crime substantially outweighs its probative value. As the above-mentioned requirements suggest, the determination of whether evidence properly may be admitted as Williams rule evidence is a highly individualized, factually intensive inquiry.
Id. at 906-08 (footnotes omitted, emphasis supplied). Here, as in Robertson, there was no determination in the trial court on whether any probative value of the testimony is substantially outweighed by its prejudicial effect. Further, there is a disturbing question in this case, also pertinent to a Williams rule analysis but unaddressed below, as to whether the prior shootings ever occurred or even whether the remark was made by Smith at the time or in the manner related by Butterfield.

PROBATIVE VALUE OF REMARK
I first address the majority's conclusion that the remark was relevant to show that Smith was the shooter. Normally, collateral-crime evidence bearing on the issue of identity must demonstrate a distinctive modus operandi, which is obviously absent here. See generally Drake v. State, 400 So.2d 1217, 1219 (Fla.1981). In this case, however, the majority posits that the remark tends to establish that Smith was the shooter because it was made immediately after the shooting of Crawford. Viewed in the context of the other evidence, its probative value for this purpose was marginal.
Independent of this remark, both Butterfield and the other key eyewitness, Brittingham, testified to actions and remarks by Smith that more directly identified him as the shooter without also implicating him in other crimes. Both witnesses testified that Smith exchanged guns with codefendant Pearce before the shootings because his gun was jammed, leaving Smith with the .40-caliber gun. According to Butterfield, Smith got out of the car first with Tuttle and then Crawford, fired shots, then returned to the car alone. Although Butterfield said he did not see either victim fall, Brittingham testified that he actually observed Smith shoot both victims. According to Brittingham, when Pearce suggested that Smith pop Tuttle in the jaw, Smith responded, "Fuck that," then spun and fired. Brittingham also testified that when Pearce asked if Tuttle was dead, Smith stated, "Yeah, he's dead. I shot him in the head with a f___ing .40." Brittingham testified that Crawford begged for his life, then Smith shot him twice, including once after Crawford fell to the ground. According to Brittingham, on the ride back after the shootings, Smith threatened to kill both men if they told what they had witnessed. Butterfield quoted Smith as stating, while pointing the gun at him, that "snitches are bitches, and bitches deserve to die." Asked if he believed Smith would kill him for "snitching," Brittingham answered in the affirmative, adding, "There was no doubt in my mind. Not after what I had seen." Further, in addition to the testimony of Butterfield and Brittingham, Tuttle, the surviving victim, testified that before he was shot, Smith got out of the car and stood in the doorway, forcing Tuttle to crawl under him to get out. Tuttle said he then put on his hat, and everything went black until he regained consciousness some time later.
In light of this testimony from two eyewitnesses and the surviving victim as to Smith's actions and statements at the time of the shootings that more clearly identified him as the shooter, the remark that *70 prompted the motion for mistrial had negligible probative value in establishing identity through an admission of guilt.
The majority also asserts that the remark has relevance because the defense put the issue of identity into question by claiming that Butterfield and Brittingham pinned the killing on Smith to protect their friend Pearce. See majority op. at 16. However, the jurors' conclusion that Smith and not Pearce was the shooter rose or fell on their determination of the credibility of Butterfield and Brittingham. If the jurors did not believe Butterfield's identification of Smith based on the rest of his testimony, as well as that of Brittingham, they were no more likely to believe him because of this remark unless it was based on the impermissible reason that Smith had a propensity for shooting people. Cf. Dennis v. State, 817 So.2d 741, 758 (Fla.) (finding low probative value in objectionable evidence admitted to show bias, in part because bias was established through other means), cert. denied, 537 U.S. 1051, 123 S.Ct. 604, 154 L.Ed.2d 527 (2002).
In my view, this case is analogous to Jackson v. State, 451 So.2d 458 (Fla.1984), in which we reversed a conviction because of improper admission of collateral crime evidence. In Jackson, we determined that reversible error occurred because the admission of the defendant's statement, in circumstances unrelated to the alleged killing, that he was a "`thoroughbred killer'... may have suggested Jackson had killed in the past, but the boast neither proved that fact, nor was that fact relevant to the case sub judice." Id. at 461. We concluded that the "testimony is precisely the kind forbidden by the Williams rule and section 90.404(2)." Id.
The negligible probative value of the purported remark distinguishes this case from precedent in which we have found no error in the admission of comparable statements showing a defendant's state of mind. The State claims that in this case, the statement was relevant to show that because Smith bragged about having shot many persons immediately after shooting Crawford, the shooting was intentional. However, as noted above, the State presented substantial additional testimony by two eyewitnesses to the shooting that Smith shot both victims, and did so intentionally. Thus, as to the question of Smith's intent in shooting Crawford, the probative value of the additional statement attributed by Butterfield to Smith that Crawford was the thirteenth or fourteenth person that Smith had shot was negligible at best.
In contrast to this case, in Coolen v. State, 696 So.2d 738 (Fla.1997), the defendant's references to his prior offenses and having been in prison were relevant to his state of mind, in that the statements provided context for his remarks that he had learned to "react very quickly" while in prison and therefore stabbed the victim upon seeing him with "something silver in his hand." Id. at 742. Unlike Coolen, in this case the boast of prior killings did not explain the reason for the shooting that Butterfield testified Smith had just committed.
The majority also concludes that the remark is inextricably intertwined or inseparable from the crime, relying on Griffin v. State, 639 So.2d 966 (Fla.1994), and a statement by Professor Ehrhardt taken from a Fourth District decision later approved by this Court. See Tumulty v. State, 489 So.2d 150 (Fla. 4th DCA 1986). In Griffin, this Court explained the reasoning for approving admission of the theft of the car keys from a hotel room despite the fact that the evidence suggested an uncharged burglary. This Court stated that "[t]he manner in which the car keys *71 were taken was inextricably intertwined with the theft of the automobile, one of the charges before the jury. The testimony was necessary to establish the entire context out of which the crime arose." Griffin, 639 So.2d at 969. In Tumulty, the court adopted Professor Ehrhardt's formulation that such evidence is admissible because it "is necessary to admit the evidence to adequately describe the deed." 489 So.2d at 153.
In this case, Smith's purported remark was not necessary to adequately describe the deed. By comparison, in Griffin, but for the testimony as to the theft of the keys, the jury would naturally have asked how (and whether) the defendant actually stole the car.

WHETHER PREJUDICE OUTWEIGHS PROBATIVE VALUE
The assessment of the statement's probative value is only the first step in determining admissibility. Under section 90.403, Florida Statutes (2002), evidence is inadmissible if its probative value "is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."
Collateral crime evidence is presumptively prejudicial. See Goodwin v. State, 751 So.2d 537, 547 (Fla.1999); Czubak v. State, 570 So.2d 925, 928 (Fla.1990). As we noted in Jackson, the danger of collateral crime evidence is that the jury will convict the defendant based on prior crimes because these unrelated crimes would "go far to convince [individuals] of ordinary intelligence that the defendant was probably guilty of the crime charged. But, the criminal law departs from the standard of the ordinary in that it requires proof of a particular crime." 451 So.2d at 461 (quoting Paul v. State, 340 So.2d 1249, 1250 (Fla. 3d DCA 1976)).
Smith's boast that the victims in this case were the thirteenth or fourteenth people that he had shot did little to establish Smith as the shooter compared with the impact the remark left with the jury that Smith was a crazed serial shooter. In this case, any minimal probative value of the remark in identifying Smith as the shooter is far outweighed by its prejudicial impact. Besides bearing only marginally on the issue of who was the shooter, the remark was highly prejudicial in that it could have led the jury to believe that Smith had previously shot many other individuals and was thus likely to have shot the victims in this case. Although we do not know how the jury perceived the remark, we do know that the trial court erroneously recalled, in its findings on one of the statutory aggravators that Smith had stated, "That's twelve and thirteen, eight more to go and I'll match Billy the Kid." This remark is exactly the type that, once heard, is difficult to forget.
The statement improperly conveyed to the jury that any doubt as to Butterfield's and Brittingham's accounts of the shootings should be resolved in favor of convicting a defendant whose braggadocio suggests he is an ongoing menace. The tremendous potential for unfair prejudice might have been ameliorated by an instruction that the jury should consider the remark solely on the issue of the identity of the shooter or to establish the entire context out of which the charged crimes arose rather than as evidence of any uncharged crime. In the absence of a curative instruction, the effect of this remark on the laypersons who made up the jury was likely to have been stronger than on the trial judge, a trained and experienced observer who nonetheless relied on an erroneously embellished version of the *72 statement in finding that the murder was cold, calculated, and premeditated.

RELIABILITY OF THE REMARK
I next address the problem of exposing the jury to the remark before it was presented to the trial judge for a determination of its reliability; i.e., whether these prior crimes occurred. In a Williams-rule analysis, the burden of proof that the defendant committed the collateral crimes would be by clear and convincing evidence. See State v. Norris, 168 So.2d 541, 543 (Fla.1964); Acevedo v. State, 787 So.2d 127, 129 (Fla. 3d DCA 2001). The majority does not reach this question because it does not construe the remark as collateral-crime evidence. However, I believe that whenever a statement implicates the defendant in uncharged crimes, it should be analyzed under precedent regarding collateral crimes.
In this case, there is a real danger that the statement either was never made or was untrue. This danger illustrates why remarks that involve collateral crimes uttered without prior screening by the trial judge should be closely monitored by both the trial court and the reviewing court. In deposition, Butterfield denied that anyone said anything after Smith got back in the car. Brittingham testified in deposition that Smith made a similar statement not immediately after the shooting but later, after returning to the residence of Smith and Pearce. Brittingham did not repeat the statement from his deposition at trial.
As to the substance of the statement attributed to Smith by Brittingham at trial, no other evidence in the record even suggests that Smith previously shot anyone. Most telling is the fact that that the State did not offer one iota of evidence during the penalty phase, when it would have been admissible, that Smith committed the other crimes.

REVERSAL REQUIRED TO ENSURE FAIR PENALTY DETERMINATION
Despite the marginal relevance of the remark to any material issue and its tremendous potential for unfair prejudice and confusion of issues, I conclude that the error is harmless beyond a reasonable doubt as to the guilt phase. I reach this conclusion not just because of the testimony of Butterfield, Brittingham, and Tuttle which strongly pointed to Smith as the shooter, but also because the remark was isolated and was not relied upon by the State in closing argument.
However, I do not believe that this error can be considered harmless as to the jury's advisory sentence or the judge's decision to impose death. After hearing the guilt phase-testimony by Butterfield that Smith boasted of the victims in this case being the thirteenth or fourteenth people he had shot and finding him guilty as charged, the jury recommended death by an eight-to-four vote. The suggestion that Smith was an incorrigible killer, or fashioned himself one, would of course be a prime focus in the jury's determination of whether he should live or die. A shift of two votes would have resulted in a life recommendation, to which the trial judge would have been required to give great weight. See Tedder v. State, 322 So.2d 908, 910 (Fla. 1975) (a jury's recommendation of life should be given great weight and should be followed unless the facts suggesting a sentence of death are so clear and convincing that virtually no reasonable person could differ).
Therefore, the error in denying a mistrial based on Butterfield's testimony necessitates a new penalty phase, and not merely reconsideration of the trial judge's erroneous finding in a new sentencing order. *73 See Lawrence v. State, 614 So.2d 1092, 1097 (Fla.1993) (erroneous admission of collateral crime evidence in the guilt phase was not harmless beyond a reasonable doubt in the penalty phase); Castro v. State, 547 So.2d 111, 115-16 (Fla.1989) (same).
For these reasons, I respectfully dissent from the decision not to order a new penalty phase before a jury.
ANSTEAD, C.J., concurs.
NOTES
[1] Smith argues (1) the trial court erred in denying a motion for mistrial when a witness testified that after shooting the second victim Smith said that was the thirteenth or fourteenth person he had shot; (2) the trial court erred in denying a motion for mistrial when the prosecutor slammed the murder weapon down on the defense table during closing argument; (3) reversible error resulted from the lack of record indicating whether the venire was sworn; (4) reversible error resulted from the prosecutor misleading the jury and court upon the legal standard for weighing aggravating and mitigating circumstances; (5) the trial court erred by instructing the jury upon and finding the CCP aggravating factor in the absence of proof of a careful plan or prearranged design; (6) the trial court erred by relying upon an unproven statement, containing the nonstatutory aggravating circumstance of future dangerousness, in finding the CCP aggravating factor; and (7) Florida's death penalty statute is unconstitutional.
[2] Section 90.404(2)(c)(1), Florida Statutes (2001), provides:

When the state in a criminal action intends to offer evidence of other criminal offenses under paragraph (a) [similar fact evidence of other crimes, wrongs, or acts relevant to proving a material fact in issue] or paragraph (b) [evidence of commission of other crimes, wrongs, or acts of child molestation in a criminal case charging child molestation], no fewer than 10 days before trial, the state shall furnish to the defendant or to the defendant's counsel a written statement of the acts or offenses it intends to offer, describing them with the particularity required of an indictment or information.
[3] Brittingham did testify in deposition that Smith stated after shooting Crawford, "That makes number 12 and 13." However, Brittingham, who testified after Butterfield at trial, did not testify to this statement at trial.
[4] Williams v. State, 110 So.2d 654 (Fla.1959).