869 So.2d 1196 (2004)
Oscar Ray BOLIN, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. SC02-37.
Supreme Court of Florida.
February 5, 2004.
Rehearing Denied April 1, 2004.
*1197 James Marion Moorman, Public Defender, and Douglas S. Connor, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Robert J. Landry, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See Art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the conviction and sentence of death.

FACTS AND PROCEDURAL HISTORY
Appellant Oscar Ray Bolin, Jr. is again before this Court on direct appeal of his conviction and sentence of death for the December 1986 murder of Teri Lynn Mathews. In 1991, a Pasco County grand jury returned an indictment charging Bolin with first-degree murder. In 1992, Bolin was tried and convicted for the murder. The trial judge followed the jury's recommendation and sentenced Bolin to death. On appeal, this Court reversed Bolin's conviction *1198 because improper evidence was admitted at trial. See Bolin v. State, 650 So.2d 19 (Fla.1995) (concluding that trial court erred in finding waiver of spousal privilege based on defendant's deposition of his ex-wife). On remand, Bolin was again tried, convicted, and sentenced to death. On appeal, this Court reversed a second time, based upon an abuse of discretion by the trial court for denying Bolin's motion for individual voir dire of prospective jurors on the issue of pretrial publicity. See Bolin v. State, 736 So.2d 1160 (Fla.1999). The second retrial commenced on October 15, 2001. Bolin was again convicted and sentenced to death.
Evidence presented at Bolin's 2001 trial included the following. Mathews' body was discovered on December 5, 1986, near the side of a road in rural Pasco County. The body was found wrapped in a sheet imprinted with a St. Joseph's Hospital logo. The body had multiple head injuries, was shoeless, and was wet, although it had not rained recently. The victim's car keys were found close to the body. Evidence collected from the scene included nylon pantyhose and a pair of white pants. There was a single set of truck tire tracks leading to the body. The victim's car was found the next day by Mathews' boyfriend, Gary McClelland, who was worried about her disappearance and attempted to trace her steps after she left work the previous day. The victim's red Honda was found parked at the Land O' Lakes Post Office, with its headlights still on. The victim's mail was found scattered on the ground, and her purse was found undisturbed on the seat inside her car.
Bolin's half-brother, Phillip, testified that he was awakened by Bolin on the night of December 4, 1986. Bolin appeared to be nervous and told Phillip that he needed Phillip's help. The two walked outside, and then Phillip heard a moaning sound, which he thought could have been a wounded dog. Instead, he saw a sheet-wrapped body, and Bolin told him that the girl was shot near the Land O' Lakes Post Office. Bolin then walked over and straddled the body with his feet, raised a wooden stick with a metal end, and hit the body several times. Phillip said that he turned away because he was scared to watch, but compared the sound to hitting a pillow with a stick. Bolin next turned on a water hose and sprayed the body. Bolin demanded that Phillip help him load the body onto the back of a black Ford tow truck, and Phillip helped by picking up the body by the ankles. Phillip testified that he noticed there were no shoes on the body and that the girl was wearing pantyhose. Phillip refused Bolin's offer of money to go with him to dispose of the body, so Bolin went alone and returned twenty to thirty minutes later. He continued talking to Phillip about the girl, stating that she had been shot in a drug deal.
At school the next day, Phillip talked with his friend, Danny Ferns, about what happened the night before and took Danny to where the body had been. Danny testified at trial, to corroborate Phillip's account of the murder, that there were blood stains on the ground at the site and that the grass in the area was disturbed. The State presented other corroborating evidence, which included the testimony of Rosie Kahles Neal. At the time of the murder, Neal co-owned with her now-deceased husband Kahles and Kahles, Inc., the business that employed Bolin as a tow truck driver. She testified that the truck Bolin was driving on the night of the murder was not returned that night, and she thought the truck had been stolen by Bolin because he could not be located and it was the first call he had handled by himself. Neal testified that Bolin was late coming to work the next morning, was wearing the same clothes as he had the day before, and *1199 had a foul smell. She further testified that Bolin played with and carried a knife and got excited when the story of the missing girl, Mathews, was reported on the news. Her testimony also corroborated the murder weapon, as she testified that she gave Bolin a "tire buddy" on the night of the murder. The tire buddy was a two-foot-long wooden club, which was drilled out and filled with lead.
Michelle Steen also offered corroborating testimony. Michelle Steen was married to Bolin's cousin, David Steen. In 1987, while Bolin visited their home, he volunteered that he had killed and beaten a girl in Florida and put a hose down her throat, and that Phillip had watched him do it.
The State then offered the perpetuated videotaped testimony of Cheryl Coby, Bolin's ex-wife, who had died after the first trial. She had been a severe diabetic, was hospitalized numerous times in 1986, often brought home hospital towels and sheets from St. Joseph's Hospital, and identified the sheet that had been wrapped around Mathews' body as a hospital sheet resembling the ones she brought home. Cheryl Coby had a post office box at the Land O' Lakes Post Office, and Bolin picked up her social security checks there when she was in the hospital.
The State also offered DNA testimony indicating that Bolin could have been the source of the semen found in a stain on Mathews' pants. Federal Bureau of Investigation forensic serology expert John R. Brown testified that he could not eliminate Bolin as the contributor of the semen stain but could eliminate Gary McClelland, Mathews' boyfriend, as the source of the stain. David Walsh, a molecular biologist, extracted DNA from the stain on the pants and found that he could exclude both the victim and McClelland as the donors of the stain on the pants. Walsh found that five of the six bands of DNA detected in the stain matched five of the six bands from Bolin's DNA. Walsh was not able to visualize one band because of the small amount of DNA remaining on the pants. Dr. Christopher Basten, an expert in population genetic frequency, testified that Bolin was 2100 times more likely to be the source of the semen than a random, unrelated person.
Bolin was convicted of first-degree murder as charged in the indictment. Following the conviction, but prior to the beginning of the penalty phase, Bolin informed the court that he did not want to have a jury advisory proceeding, put on mitigation evidence, or question witnesses. The trial judge held an on-the-record colloquy with Bolin; the trial judge made a finding that Bolin's waiver was knowing, voluntary and intelligent; and the penalty phase proceeded without a jury. The State presented aggravating evidence through three witnesses with regard to aggravating circumstances. The Court stated that the defense could present whatever evidence in mitigation that the defense wanted to present at a Spencer[1] hearing, which was thereafter scheduled.
The Spencer hearing was held on December 14, 2001, and again defense counsel told the court that Bolin instructed it not to call any witnesses or present any evidence. The prosecutor suggested that pursuant to Muhammad v. State, 782 So.2d 343 (Fla.2001), the court should obtain a presentence investigation to look for mitigation and review prior testimony in prior trials regarding mitigation. The court questioned Bolin about his decision, and Bolin declared his desire to waive presentation of penalty-phase evidence, *1200 stating, "I've read Muhammad three times. I understand the philosophy behind Muhammad, and I understand what counsel has told me. I've discussed it with them. I made a free and voluntary decision." At the sentencing hearing on December 28, 2001, Bolin was once again sentenced to death for the murder of Mathews. The court followed the Muhammad guidelines and found three aggravating factors,[2] one statutory mitigating factor,[3] and twelve nonstatutory mitigating factors.[4] The court found that the three aggravators outweighed all of the mitigators combined.

FOR-CAUSE CHALLENGES
In his first claim, Bolin asserts that the trial court wrongfully denied his voir dire cause challenges as to prospective jurors Almas, Glass, and Gale, thus forcing him to use peremptory challenges. Bolin was allowed ten peremptory challenges, and he used all ten of those challenges. Pursuant to Trotter v. State, 576 So.2d 691 (Fla. 1990), Bolin then requested two additional peremptories, identifying jurors Cox and Bradley as the jurors upon whom he would have exercised challenges if the additional challenges were granted. The trial court refused to grant the extra peremptory challenges. Two alternate jurors were seated, both of whom were accepted by Bolin.
We find no basis for relief. The record of the voir dire examinations of jurors Cox and Bradley demonstrate that the examinations consisted of such confusing and leading questions that the answers to the questions which formed the basis of the cause challenges appear to have been merely answers prompted by the questions rather than the fixed beliefs of the jurors. Based upon the questions and answers of jurors Cox and Bradley, we do not find that the trial court's decision to deny the cause challenges was an abuse of discretion. Hertz v. State, 803 So.2d 629, 638 (Fla.2001). Moreover, even if the trial court erred in denying the cause challenges during the voir dire examinations, any such error as to juror Cox was subsequently rendered harmless and, as to juror Bradley, was later waived.
In respect to juror Cox, he was excused during the trial because of illness and thus was not a member of the jury *1201 that returned the verdict in the case. Cox was replaced by an alternate juror, to whom Bolin had no objection.
With regard to juror Bradley, during the trial she advised the court that she recognized a witness, the victim's mother, as a shopper at the Home Depot where Bradley worked as a cashier. The court questioned Bradley, who stated that her knowledge of the witness would not affect her decision-making process. Defense counsel then moved to strike Bradley on the basis that she could not be fair. The court did not strike Bradley but stated to defense counsel, "Towards the end of the trial you can renew that and we'll take it up again." At the conclusion of the trial but before deliberations, the court gave defense counsel the option to replace Bradley with the second alternate juror. The record contains the following discussion:
MR. HALKITIS [prosecutor]: Judge you have to make a determination on Ms. Bradley.
THE COURT: We're going to do that now. Do you want a few minutes to chat?
MR. WILLIAMS [defense counsel]: We're going to withdraw our motion.
THE COURT: Okay. So you're going to keep Ms. Bradley?
MR. WILLIAMS: Yes.
THE COURT: For the record, did you discuss that with Mr. Bolin, he's in agreement with that?
MR. WILLIAMS: I don't know if we did or not.
MR. SWISHER [defense counsel]: I'm not sure. Let me go ask.
After consulting with Mr. Bolin, we're going to keep Ms. Bradley.
COURT: Okay. Just to make it clear, when I said we'd entertain your objection at the end of the trial had you elected to excuse Ms. Bradley, I'm inclined to grant that.
With that knowledge in mind, Mr. Bolin wants to keep Ms. Bradley.
MR. HALKITIS: Could the record reflect that they've had some time to consult with Mr. Bolin and they have consulted with Mr. Bolin.
It is plain that Bolin elected to keep juror Bradley and waived his objection to juror Bradley when he was given the opportunity to remove her at the conclusion of the trial before deliberations.

REPLACEMENT OF JUROR COX
Bolin next argues that the trial court abused its discretion by replacing juror Cox with an alternate juror. Midway through the trial, juror Cox called the trial court's office and told a judicial assistant and the jury manager that he had been unable to sleep, was having breathing problems, and was going to the doctor or hospital. The trial court held a hearing at which both sides inquired of the judicial assistant and the jury manager about juror Cox's condition. The court then found that it was impractical to delay the trial on the chance that juror Cox might be able to return, given that he was elderly, on oxygen, had emphysema, and had an attack the night before. We find no abuse of discretion by the trial judge in excusing juror Cox and having the previously accepted alternate juror replace him.

USE OF TERM "MATCH" IN DNA EVIDENCE
Bolin next claims that the testimony about the DNA comparison of the semen sample from the victim's pants and Bolin's blood was improper because David Walsh, who analyzed the DNA in question, used the word "match." We find no merit in this claim. First, the record reveals *1202 that no Frye[5] hearing was requested with respect to this DNA evidence. Thus, there was no challenge similar to that in Brim v. State, 695 So.2d 268 (Fla.1997). This claim is only a challenge as to the use of the term "match." The testimony of expert Walsh as well as the testimony of the two other DNA experts were subject to full cross-examination. In this record we do not find that the use of the term "match" was error, but even if it was error, such error would be harmless beyond a reasonable doubt.

LACK OF RECORD OF VENIRE'S OATH
Bolin next claims that he is entitled to a new trial or proof of the venire's oath because the record does not reflect whether the prospective jurors were sworn prior to voir dire. Florida Rule of Criminal Procedure 3.300 states, "The prospective jurors shall be sworn collectively or individually, as the court may decide." Bolin accurately contends that the record does not indicate whether the venire was sworn prior to voir dire. Rather, the record begins with the judge's opening remarks and proceeds directly to voir dire. Although the record does not indicate whether the venire was sworn, defense counsel did not object at any point during the trial to a failure to give the oath to the venire and thus waived any objection. Id. We recently addressed this issue in Smith v. State, 866 So.2d 51 (Fla. 2004). In Smith, there was no record evidence that the venire was sworn, and we concluded that no fundamental error occurred. Consistent with Smith, we deny relief on this claim.

WAIVER OF PENALTY-PHASE JURY
Bolin's final claim is that the trial court erred by accepting Bolin's waiver of a penalty-phase jury recommendation. We have carefully reviewed the record on this issue and find that the trial judge correctly considered and ruled upon Bolin's waiver.
After the jury returned its verdict of guilty, Bolin advised the trial court that he did not want to have a jury for the penalty phase. There followed an extensive hearing before the trial court in which the prosecutor, Bolin's counsel, and Bolin himself discussed the proper procedure to be used in view of Bolin's stated decision to waive the jury.
This Court's recent decision in Muhammad v. State, 782 So.2d 343 (Fla.2001), was discussed at length with the prosecutor, defense counsel, and the trial court, each working to comply with what is required when a capital defendant states an intent to effect a waiver. That discussion follows.
MR. SWISHER [defense counsel]: He does not want us to call mitigation witnesses, that's correct.
THE COURT: So you're saying two things then. He doesn't want a jury recommendation and he doesn't want to utilize mitigating witnesses, whether there's a recommendation from a jury or not?
MR. SWISHER: Correct.
THE COURT: Okay. Do you want to have him put anything on the record? He has that opportunity now.
MR. SWISHER: He's sitting right here next to me and I've been talking out loud, so I assume if he disagrees with me, he'll say something.
THE COURT: Well, let's not assume anything.
MR. SWISHER: Well, ask him.

*1203 THE COURT: Do you want to add anything, Mr. Bolin, to what Mr. Swisher has said in your behalf?
[BOLIN]: I instructed counsel to not pursue a jury mitigation advisory sentence.
THE COURT: And he said more than that. Was there more to what you want to acknowledge in terms of the recommendation in terms of mitigation?
MR. SWISHER: Do you want us to put on mitigation evidence or not, to the jury? Do you want us to put on mitigation evidence in front of the jury?
[BOLIN]: No.
Then a brief recess was taken by the court, after which this discussion continued.
THE COURT: All right. Let's see if we can finalize this current scenario.
Defense want to put anything on the record before I do additional inquiry of Mr. Bolin on this issue?
MR. SWISHER: No, sir.
THE COURT: All right. Mr. Bolin, to reiterate. I think we've covered this. I want to make sure there's no doubt in your mind or mine as to what you're telling me.
You want to waive your right to a jury recommendation; is that correct?
[BOLIN]: Yeah.
THE COURT: You want to waive the penalty phase by a jury, correct?
[BOLIN]: Yes.
THE COURT: In other words, you understand a penalty phase would be conducted, but it would be conducted by the Court and the Court alone. Do you understand that?
[BOLIN]: Exactly.
THE COURT: Okay. Now, I know you're not, but in an abundance of caution, are you under the influence of any alcohol, drugs, or medication?
[BOLIN]: No.
THE COURT: Are you making this waiver of your own free will, understanding your rights?
[BOLIN]: Yes.
THE COURT: Okay. You consider yourself making an intelligent waiver?
[BOLIN]: I'm not under any influence or anything.
THE COURT: Well, no, because I've seen you participating right along. You seem to be very articulate, very intelligent. You seem to understand all these proceedings, from my observations.
Is there anything you don't understand, you need your attorneys to clarify at this juncture?
[BOLIN]: No.
THE COURT: You understand everything; is that correct?
[BOLIN]: (Indicating.)
THE COURT: Okay. Counsel, can you assure the Court your client is fully aware of his rights and making a knowing and intelligent waiver?
MR. SWISHER: Yes, sir.
THE COURT: All right. Now you understand if you waiveif I dismiss this jury, send them home, and you waive your right to have a jury recommendation, that's irreversible? You can't turn around tomorrow or next week or five weeks or a month from now and say, oh, now I want a recommendation. It's a final, irrevocable waiver. Do you understand that?
[BOLIN]: It's a waiver of a jury recommendation as far as mitigation to them, nothing to do with the Court.
THE COURT: Right.
[BOLIN]: Yeah.
THE COURT: There's no jury recommendation going to be sought today *1204 or any other time. You're waiving that is irreversible, for all time. Do you understand that?
[BOLIN]: Yes, sir.
THE COURT: Okay. Either counsel have anything else?
MR. HALKITIS [the prosecutor]: Judge, I'd just like you to ask the defendant whether he's had enough time to confer with his lawyers. Does he feel that he's had an opportunity to discuss this situation and that he doesn't need any more time?
THE COURT: Well, that's a fair request, even though it's pretty fairly obvious we've had several breaks in this to ferret out the final position.
Have you had a chance to speak to your lawyers, sir, to your satisfaction?
[BOLIN]: I've talked to both Mr. Swisher and Mr. Williams.
THE COURT: All right. So you've had all your questions answered, right?
[BOLIN]: Yes, sir.
THE COURT: So you still feel you're making it of your own free will knowing your legal rights, and after speaking to your lawyers, this is your final decision; is that correct?
[BOLIN]: Yes, sir.
Based upon this record, we find no error in the trial court accepting Bolin's waiver of the penalty-phase jury. This case is distinguishable from Thibault v. State, 850 So.2d 485 (Fla.2003), in which there was not a sufficient waiver. Additionally, even if there was merit to Bolin's claim on appeal, Bolin would not be entitled to relief since he did not attack the voluntariness of his waiver in the trial court. Griffin v. State, 820 So.2d 906, 912 (Fla.2002).

PROPORTIONALITY
This Court must review the proportionality of a death sentence, even if the issue has not been raised by the defendant. See Jennings v. State, 718 So.2d 144, 154 (Fla.1998). To determine whether a sentence of death is a proportionate penalty, this Court must consider the totality of the circumstances of the case and compare this case with other capital cases. Urbin v. State, 714 So.2d 411, 416-17 (Fla. 1998). The trial court found three aggravating factors, one statutory mitigator, and twelve nonstatutory mitigators. However, each aggravator was given great weight by the court, while the mitigators were found insignificant. The trial court found that "each and every one of the aggravating factors in this case, standing alone, is more than sufficient to outweigh the entirety of mitigation." The instant case is similar to other cases where death was imposed. See Singleton v. State, 783 So.2d 970 (Fla. 2001) (upholding sentence where two weighty aggravators justified death sentence over three statutory and nine nonstatutory mitigators); Johnston v. State, 841 So.2d 349, 360 (Fla.2002) (upholding sentence where victim was sexually assaulted and later killed, and trial court found two weighty aggravators justified death sentence over one statutory and twenty-six nonstatutory mitigators). Therefore, we find that Bolin's death sentence is proportionate. See Spencer v. State, 691 So.2d 1062 (Fla.1996).

SUFFICIENCY OF EVIDENCE
This Court must review the sufficiency of the evidence to determine whether sufficient evidence exists to support a first-degree murder conviction, even if this issue has not been raised by the defendant. See Mansfield v. State, 758 So.2d 636, 649 (Fla.2000). Upon a thorough review of the record, substantial evidence exists to support Bolin's conviction. There is substantial testimony in the record of Bolin's half-brother, Phillip, concerning Bolin's activities on the night of the murder. Both Bolin and the victim had post office boxes at the Land O' Lakes *1205 Post Office. Mathews' car was found the next morning at the post office, with its headlights still on and her mail on the ground. Bolin picked up his wife's social security check on the night of the murder from that post office. The victim's body was found wrapped in a sheet from a hospital in which Bolin's then wife, Cheryl Coby, had been hospitalized and from which Coby testified she had brought home sheets like the one wrapped around the victim's body. Bolin failed to return his employer's tow truck to the business on the night of the murder. The victim's body revealed trauma wounds to the victim's head that were consistent with the tire buddy given to Bolin, as corroborated by Phillip Bolin's eyewitness portrayal of the beating of what Phillip testified Bolin told him was a girl's body wrapped in a sheet. Phillip also corroborated that the body was shoeless but that the girl was wearing pantyhose. Bolin's semen was found on the victim's pants, as determined by DNA testing which revealed that Bolin was 2100 times more likely to be the source of the semen than a random, unrelated person. Based upon this evidence and the other evidence in the record, we conclude that the evidence is sufficient to support Bolin's first-degree murder conviction.

CONCLUSION
For the reasons set forth above, we affirm Bolin's conviction of first-degree murder and sentence of death.
It is so ordered.
ANSTEAD, C.J., and WELLS, PARIENTE, LEWIS, CANTERO, and BELL, JJ., concur.
QUINCE, J., recused.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] The aggravating factors found by the trial court were: (1) Bolin was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person (great weight); (2) the capital felony was committed while Bolin was engaged in the kidnapping of the victim from the post office or defendant intended to commit a sexual battery (great weight); and (3) the capital felony was heinous, atrocious, or cruel (great weight).
[3] The court found the statutory mitigator that the capacity of Bolin to appreciate the criminality of his conduct was substantially impaired because of brain damage, but the court gave this mitigator little weight.
[4] The court found twelve nonstatutory mitigators: (1) Bolin had a somewhat difficult childhood (some weight); (2) he had a sporadic and minimal educational experience (little weight); (3) he received improper care during childhood (little weight); (4) he was under stress at the time of the murder because of his wife being pregnant and frequently ill (slight weight); (5) Bolin was twenty-four years of age at the time he committed the murder; (6) he was respectful to other parties in this case (little weight); (7) he saved another life by rescuing a drowning person (some weight); (8) he was employed at the time of the offense (slight weight); (9) he received no adverse disciplinary reports from prison (some weight); (10) he had used alcohol and drugs as a minor, but did not have a dependancy problem (slight weight); (11) he had some evidence of minor brain damage or mental illness (little weight); and (12) he had a medical history that included multiple suicide attempts (slight weight).
[5] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).