[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No.  15-15710-P

_____

IN RE: OSCAR RAY BOLIN, JR.,

Petitioner.

_____

Application for Leave to File a Second or
Successive Habeas Corpus Petition 28 U.S.C. Section 2244(b)
by a Prisoner in State Custody

_____

Before:  ED CARNES, Chief Judge, TJOFLAT and WILLIAM H. PRYOR, Circuit Judges.

BY THE COURT:

Pursuant to 28 U.S.C. § 2244(b)(3)(A), Oscar Ray Bolin, Jr., has filed an application seeking an order authorizing the district court to consider a second or successive petition for a writ of habeas corpus.  Such authorization may be granted only if:

(A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2). "The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection." *Id.* § 2244(b)(3)(C).

In his counseled application, Bolin indicates that he wishes to raise two claims in a second or successive § 2254 petition. Specifically, Bolin alleges that his claims rely on two separate "areas" of newly discovered evidence. First, Bolin claims that, in March 2014, he learned that an Ohio inmate named Steven Kasler had confessed to the murder for which Bolin was convicted. Second, he claims that a 2014 report from the U.S. Department of Justice ("DOJ") demonstrated that Michael Malone, a former forensic analyst with the Federal Bureau of Investigation ("FBI"), "likely" compromised the physical evidence in his case. Bolin argues that the State's failure to timely disclose this newly discovered evidence violated his constitutional rights under *Brady v. Maryland.*[1] Finally, Bolin argues, in the alternative, that we may rule that a second or successive § 2254 petition is unnecessary in this case because, pursuant to *McQuiggin v. Perkins,*[2] "his time-barred habeas petition did not count for purposes of § 2244(b)." Accordingly, Bolin requests permission to file a successive § 2254 petition to raise his claims of newly discovered evidence and an order granting a stay of execution pending the outcome of the proceedings on the successive § 2254 petition. Bolin submitted no documents in support of his application.

On December 31, 2015, the State filed a response, opposing Bolin's application and motion to stay. The State argues that the Kasler confession does not demonstrate by clear and convincing evidence that no reasonable factfinder would have found Bolin guilty of the crime because (1) the confession had "substantial credibility issues," (2) the evidence against Bolin was

---

[1] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[2] *McQuiggin v. Perkins,* 569 U.S. ___, 133 S. Ct. 1924, 185 L. Ed. 2d 1019 (2013).

"overwhelming," and (3) purported "new" evidence of Bolin's innocence in other, unrelated murder cases is not based on recent information and has no bearing on the instant case. Further, the State argues that the Kasler confession does not state a cognizable constitutional error because, under prevailing case law, the State's *Brady* obligation does not extend after a conviction, and, in any event, Bolin has failed to demonstrate any of the necessary elements of a *Brady* violation. As to the Malone materials, the State argues that Bolin was procedurally barred from raising this claim in his state successive post-conviction motions because he was "aware of this information for over a decade." Additionally, the State argues that there was no *Brady* violation because, given the fact that Malone was not involved in any of the forensic testing in the instant case and did not testify at trial, as well as "the overwhelming evidence of Bolin's guilt," any evidence regarding Malone was not material. Finally, the State refutes Bolin's *McQuiggin*-based claim because it contends that *McQuiggin* does not apply to second or successive habeas applications.

## I.      Factual Background and Procedural History

In 2001, Bolin was convicted and sentenced to death for the murder of Teri Lynn Matthews.[3] *Bolin v. State*, 869 So. 2d 1196, 1198 (Fla. 2004) ("*Bolin I*").

*Underlying facts and state trial proceedings*

The Florida Supreme Court has summarized the trial evidence of Bolin's offense as follows:

> Matthews' body was discovered on December 5, 1986, near the side of a road in rural Pasco County. The body was found wrapped in a sheet imprinted with a St. Joseph's Hospital logo. The body had multiple head injuries, was shoeless, and was wet, although it had not rained recently. The victim's car keys were found close to the body. Evidence collected from the scene included nylon pantyhose

---

[3] This was the third time Bolin was convicted and sentenced to death for the murder of Matthews, after his two prior convictions were reversed. *Bolin I,* 869 So. 2d at 1197–98.

3

and a pair of white pants. There was a single set of truck tire tracks leading to the body. The victim's car was found the next day by Matthews' boyfriend, Gary McClelland, who was worried about her disappearance and attempted to trace her steps after she left work the previous day. The victim's red Honda was found parked at the Land O' Lakes Post Office, with its headlights still on. The victim's mail was found scattered on the ground, and her purse was found undisturbed on the seat inside her car.

Bolin's half-brother, Phillip, testified that he was awakened by Bolin on the night of December 4, 1986. Bolin appeared to be nervous and told Phillip that he needed Phillip's help. The two walked outside, and then Phillip heard a moaning sound, which he thought could have been a wounded dog. Instead, he saw a sheet-wrapped body, and Bolin told him that the girl was shot near the Land O' Lakes Post Office. Bolin then walked over and straddled the body with his feet, raised a wooden stick with a metal end, and hit the body several times. Phillip said that he turned away because he was scared to watch, but compared the sound to hitting a pillow with a stick. Bolin next turned on a water hose and sprayed the body. Bolin demanded that Phillip help him load the body onto the back of a black Ford tow truck, and Phillip helped by picking up the body by the ankles. Phillip testified that he noticed there were no shoes on the body and that the girl was wearing pantyhose. Phillip refused Bolin's offer of money to go with him to dispose of the body, so Bolin went alone and returned twenty to thirty minutes later. He continued talking to Phillip about the girl, stating that she had been shot in a drug deal.

At school the next day, Phillip talked with his friend, Danny Ferns, about what happened the night before and took Danny to where the body had been. Danny testified at trial, to corroborate Phillip's account of the murder, that there were blood stains on the ground at the site and that the grass in the area was disturbed. The State presented other corroborating evidence, which included the testimony of Rosie Kahles Neal. At the time of the murder, Neal co-owned with her now-deceased husband Kahles and Kahles, Inc., the business that employed Bolin as a tow truck driver. She testified that the truck Bolin was driving on the night of the murder was not returned that night, and she thought the truck had been stolen by Bolin because he could not be located and it was the first call he had handled by himself. Neal testified that Bolin was late coming to work the next morning, was wearing the same clothes as he had the day before, and had a foul smell. She further testified that Bolin played with and carried a knife and got excited when the story of the missing girl, Matthews, was reported on the news. Her testimony also corroborated the murder weapon, as she testified that she gave Bolin a "tire buddy" on the night of the murder. The tire buddy was a two-foot-long wooden club, which was drilled out and filled with lead.

Michelle Steen also offered corroborating testimony. Michelle Steen was married to Bolin's cousin, David Steen. In 1987, while Bolin visited their home, he

4

volunteered that he had killed and beaten a girl in Florida and put a hose down her throat, and that Phillip had watched him do it.

The State then offered the perpetuated videotaped testimony of Cheryl Coby, Bolin's ex-wife, who had died after the first trial. She had been a severe diabetic, was hospitalized numerous times in 1986, often brought home hospital towels and sheets from St. Joseph's Hospital, and identified the sheet that had been wrapped around Matthews' body as a hospital sheet resembling the ones she brought home. Cheryl Coby had a post office box at the Land O' Lakes Post Office, and Bolin picked up her social security checks there when she was in the hospital.

The State also offered DNA testimony indicating that Bolin could have been the source of the semen found in a stain on Matthews' pants. Federal Bureau of Investigation forensic serology expert John R. Brown testified that he could not eliminate Bolin as the contributor of the semen stain but could eliminate Gary McClelland, Matthews' boyfriend, as the source of the stain. David Walsh, a molecular biologist, extracted DNA from the stain on the pants and found that he could exclude both the victim and McClelland as the donors of the stain on the pants. Walsh found that five of the six bands of DNA detected in the stain matched five of the six bands from Bolin's DNA. Walsh was not able to visualize one band because of the small amount of DNA remaining on the pants. Dr. Christopher Basten, an expert in population genetic frequency, testified that Bolin was 2100 times more likely to be the source of the semen than a random, unrelated person.

*Bolin I,* 869 So. 2d at 1198–99. Bolin was convicted and sentenced to death, and the Florida Supreme Court affirmed his conviction and sentence. *Id.* at 1199–1200, 1205.

*Relevant state successive post-conviction motions*

In late 2014, Bolin filed two successive post-conviction motions in state court, alleging essentially the same claims that he raises in the instant application. *See Bolin v. State*, No. SC15-2149, 2015 WL 9172921, at *3 (Fla. Dec. 17, 2015) ("*Bolin II*"). The state post-conviction court granted an evidentiary hearing on Bolin's Kasler-confession claim, but Kasler committed suicide before the hearing could take place. *Bolin II*, 2015 WL 9172921, at *3. Bolin then amended his motion, claiming that Kasler's confession could be admitted as a statement against penal interest. *Id.*

5

The state post-conviction court conducted an evidentiary hearing on Bolin's amended motion on August 24, 2015. *Id.* at *5. Stephen Crane, another Ohio inmate who tipped off Bolin's wife to Kasler's confession, refused to testify. *Id.* Bjorn Brunvard, Bolin's counsel, testified that he heard Kasler confess to Matthews's murder and provide accurate details about the crime during a September 2014 conference call. *Id.* On cross-examination, Brunvard stated that Kasler confessed to approximately 20 murders and said he would confess to a "number of murders" in order to avoid going to federal prison in Louisiana. *Id.* Kenneth Karnig, who runs a crime memorabilia website, testified that Kasler had confessed at the request of another memorabilia dealer and that Kasler had told him that he did not commit the Matthews murder. *Id.*

Additionally, according to the Florida Supreme Court, Bolin moved for post-conviction DNA testing in December 2014, requesting that the evidence in the Matthews case be compared to Kasler's DNA profile. *Id.* at *3. Although the state court denied the motion, "DNA testing was ordered and completed [on] August 26, 2015. The results excluded Kasler as a contributor to the samples collected from Matthews, but did not exclude Bolin." *Id.*

Following the hearing, the state post-conviction court denied both successive post-conviction motions, determining that neither the Kasler nor Malone sets of newly discovered facts were likely to produce an acquittal or a reduced sentence and, additionally, that Bolin had not established a *Brady* violation with respect to either claim. *Id.* at *3–9. The Florida Supreme Court upheld the lower court's conclusions. *Id.*

## II.     Discussion

Bolin does not allege that any of the claims in his current application rely on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." *See* 28 U.S.C. § 2244(b)(2)(A). Instead, Bolin's application

6

centers on his arguments that certain newly discovered evidence, that he could not have previously discovered through the exercise of due diligence, is sufficient to establish by clear and convincing evidence that, but for *Brady* constitutional violations, no reasonable factfinder would have found him guilty of the murder of Matthews. *See id.* § 2244(b)(2)(B).

To receive authorization to bring a claim in a successive § 2254 petition based on newly discovered facts, Bolin must make a *prima facie* showing that, first, the facts at issue would not have been uncovered through a reasonable investigation undertaken before the litigation of his initial § 2254 petition. *See In re Boshears*, 110 F.3d 1538, 1540 (11th Cir. 1997) (construing § 2244(b)(2)(B)(i)). Accordingly, he must explain why the same means that eventually uncovered the new facts could not have been employed earlier. *In re Magwood*, 113 F.3d 1544, 1549–50 (11th Cir. 1997). Second, he must allege newly discovered facts that, taken as true, establish a constitutional error. *See Boshears*, 110 F.3d at 1541 (construing § 2244(b)(2)(B)(ii)). Finally, we evaluate these facts in light of the evidence as a whole to determine whether, had Bolin known these facts at the time of his trial, the application "clearly proves that the applicant could not have been convicted." *Id.* "In other words, the application must be denied if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citation and quotations omitted).

Bolin's counseled application proposes two claims of *Brady* violations that purport to rely on two separate newly discovered factual predicates. Additionally, Bolin appears to argue that his claims of actual innocence render invalid the dismissal of his first § 2254 petition as time-barred, thus rendering this application unnecessary. Because Bolin's claims do not meet the statutory criteria for relief, and because he is in fact subject to the requirements of § 2244(b)(2), his application is due to be denied.

7

1.     The Kasler confession

Bolin claims that he first learned that Kasler had confessed to Matthews's murder in March 2014 when Crane contacted Bolin's wife. Kasler then confessed to members of Bolin's legal team, including Brunvand, in September 2014. Bolin also learned that the Florida Department of Law Enforcement and Attorney General's Office had received correspondence from Crane regarding the confession "in late 2013." Bolin argues that the State's failure to alert him to this correspondence was a *Brady* violation and prejudiced him because he could have raised the issue earlier, before Kasler committed suicide.

In *Brady*, the Supreme Court held that due process requires a prosecutor to disclose material exculpatory evidence to the defendant before trial. *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196–97. The Supreme Court has also concluded that *Brady* does not apply in the post-conviction context, reasoning that "[a] criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man." *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68–69, 129 S. Ct. 2308, 2319–20, 174 L. Ed. 2d 38 (2009) (reversing the Ninth Circuit's conclusion that a state prisoner had a due-process right to access DNA evidence in a post-conviction proceeding analogous to the right to be provided with exculpatory evidence prior to trial under *Brady*). The Supreme Court noted that "nothing in our precedents suggest[s] that [*Brady*'s] disclosure obligation continue[s] after the defendant [is] convicted and the case [is] closed." *Id.* at 68, 129 S. Ct. at 2319–20.

Bolin acknowledges in his application that, in order to be granted leave to file a second or successive habeas petition under § 2244(b)(2)(B)(ii), he must demonstrate both clear and convincing evidence of his actual innocence and another constitutional violation. *In re Davis*, 565 F.3d 810, 823–24 (11th Cir. 2009). Here, is it undisputed that the purported *Brady* violation

8

with respect to the revelation of the Kasler confession happened in 2013, many years after Bolin's 2001 conviction. Because *Brady* is not a cognizable constitutional right in post-conviction proceedings, Bolin has failed to establish the necessary constitutional violation, as required by *Davis*. *See Davis*, 565 F.3d at 824; *Osborne*, 557 U.S. at 68–69, 129 S. Ct. at 2319–20.

Even assuming Bolin could have established the necessary constitutional violation—which he has failed to do here—his Kasler-confession claim would still fail because he cannot show "by clear and convincing evidence" that, but for the alleged constitutional error, "no reasonable factfinder would have found [him] guilty of the underlying offense." *See* 28 U.S.C. § 2244(b)(2)(B)(ii). Given the overwhelming evidence of Bolin's guilt and the lack of reliability of Kasler's highly suspect confession discussed above, a reasonable factfinder could certainly conclude, in light of Kasler's purported confession, that Bolin murdered Teri Lynn Matthews. Accordingly, Bolin cannot meet the requirements of § 2244(b)(2)(B)(ii).

2.      The Malone materials

Bolin also argues that Malone, the former FBI analyst, "likely mishandled and compromised critical serological evidence in [his] case," and that Malone was suspected of misconduct that led to multiple false convictions. Bolin concedes that Malone's work on the Matthews case was not admitted into evidence. Nevertheless, Bolin maintains that "the State submitted essentially all of the physical evidence that was collected in this case directly to Malone." He alleges that Malone handled and prepared "at least some, and perhaps all, of the physical evidence" that underwent serological and DNA testing in his case.

Additionally, Bolin claims that, in January 2014, the DOJ e-mailed his current counsel. The e-mail stated that, in September 2013, the DOJ had notified Bolin's prior counsel of a 1997

report from the DOJ's Office of the Inspector General ("OIG") identifying the work of 13 FBI examiners whose work "may have failed to meet professional standards."  The January 2014 e-mail also noted that "in 1999, the prosecutor advised the 1996 FBI Laboratory Task Force that Malone's work had not been material to the verdict" in the Matthews case.  In July 2014, the DOJ again contacted Bolin's counsel to alert him to a new report from the OIG, which specifically addressed deficiencies in Malone's work with the FBI.  The 2014 OIG report stated that the FBI task force knew that Malone's work was "consistently problematic" "as early as 1999."  The report also stated that "independent scientists deemed approximately 96 percent of the Malone cases to be problematic."

In support of this claim, Bolin also points to the testimony of Dr. Frederic Whitehurst, another former FBI analyst, who testified about the Malone materials in a separate case for another murder for which Bolin was convicted.  Bolin asserts that Whitehurst testified there that Malone's "egregious acts . . . make[] evidence that he had in hand suspect" and "any testing conducted by Malone is not reliable and has no credibility[.]"

In arguing his *Brady* claim, Bolin alleges that the DOJ informed the State of its investigation into Malone as early as 1998, several years before his third, and final, trial.  He notes that, in 1999, the State allegedly responded to the DOJ that Malone's work had been immaterial to the instant case.  Bolin claims that the State did not disclose to him (1) evidence of the DOJ's ongoing investigation against Malone, (2) evidence "of the fact that Malone apparently handled the evidence that was submitted for serological testing," or (3) "evidence of the communications between the DOJ and State."  He contends that the 2014 OIG report demonstrates that Malone engaged in "scores of negligent and intentional acts of misconduct that

10

brought about the presentation of false evidence and led to false convictions in numerous criminal cases."

Here, Bolin's *Brady* argument leans on the 2014 communications between the DOJ and his attorneys and the "ground-breaking" 2014 OIG report. To the extent that Bolin challenges the state's failure to disclose the 2014 OIG report, such post-conviction *Brady* claims are barred under *Osborne*. *See Osborne*, 557 U.S. at 68–69, 129 S. Ct. at 2319–20. To the extent that Bolin argues that the State should have revealed the ongoing investigation against Malone prior to Bolin's 2001 trial, however, his claim still fails. As an initial matter, he concedes that the 1997 OIG report, first brought to his predecessor counsel's attention in 2013, "did not make any findings that would have called into question the reliability of Malone's work in the instant case." Further, even if the State had disclosed before trial that Malone was under investigation and may have handled some of the physical evidence in his case, it is undisputed that the physical and DNA evidence at Bolin's third trial was analyzed and presented by forensic examiners other than Malone. *Bolin I*, 869 So. 2d at 1199. Indeed, Bolin admits in his application that Malone's work matching fibers in the Matthews case to those in another murder case in which he was a suspect was not admitted into evidence. Without this link between Malone and the trial evidence presented in the Matthews case, Bolin essentially argues that, because Malone "apparently" prepared and handled some of the physical evidence in his case, and Malone was later found to have done shoddy work on many cases, his involvement tainted all of the physical evidence in the Matthews case. This bare assertion is too speculative to support relief. *See Boshears*, 110 F.3d at 1541. Even discounting the physical and DNA evidence altogether, the State presented other evidence linking Bolin to the murder, including his

11

half-brother Phillip's eye-witness account and corroborating testimony from Danny Ferns, Rosie Kahles Neal, Michelle Steen, and Cheryl Coby. *Bolin I*, 869 So. 2d at 1198–99.

Under these circumstances, Bolin has not demonstrated by clear and convincing evidence that, but for the State's alleged *Brady* error, "no reasonable factfinder would have found [him] guilty of the underlying offense." *See* 28 U.S.C. § 2244(b)(2)(B).

3.    Actual innocence/*McQuiggin* claim

Finally, Bolin argues, in the alternative, that we should rule that the current application is unnecessary because *McQuiggin* opened an "actual innocence gateway" for the courts to consider his current proposed § 2254 petition notwithstanding the criteria set forth in § 2244(b). Thus, he contends that, because he has made a showing of both his actual innocence and *Brady* violations, his first untimely petition cannot be counted against him for § 2244(b) purposes, and the district court may consider his claims on the merits.[4]

Bolin's argument regarding *McQuiggin* is misplaced and does not afford him relief. In *McQuiggin*, the Supreme Court held that, if proved, actual innocence permits habeas petitioners to overcome the expiration of the statute of limitations in order to have the merits of his or her constitutional claims heard. *McQuiggin*, 569 U.S. at __, 133 S. Ct. at 1928.

Although *McQuiggin* was decided in the context of collateral review, the Supreme Court indicated that its holding was limited to initial habeas petitions and was not applicable to second or successive petitions. *See id.*, 569 U.S. at __, 133 S. Ct. at 1933–34 (differentiating initial habeas petitions from second or successive petitions in the context of the miscarriage-of-justice

---

[4] On the same day that he filed the instant application, Bolin also filed a § 2254 petition in the district court, raising essentially the same claims as those presented here. (CM/ECF for U.S. Dist. Ct. for M.D. Fla., case no. 8:15-cv-02943, doc. 1). On December 30, 2015, the district court dismissed it as impermissibly successive but granted Bolin a COA "on the issue of the district court's jurisdiction." (*Id.*, doc. 8). Bolin has appealed that ruling, and the State has filed a motion to vacate the COA. (11th Cir. Docket, Case No. 15-15761, docs. 1, 3).

exception). Further, Bolin does not point to, and research does not reveal, any case law supporting his argument that *McQuiggin* allows us to discard his first untimely § 2254 petition and consider his constitutional claims afresh. Even if, as Bolin argues, *McQuiggin*'s "essential principle" should be extended to create an exception to the bar against successive petitions where the initial petition was dismissed as time-barred, the exception would not apply because his initial § 2254 petition was alternatively denied on the merits.

Finally, to the extent that Bolin is attempting to raise a discrete, freestanding claim of actual innocence, he may not do so. *See Davis*, 565 F.3d at 823–24 (considering, and rejecting, the argument that a free-standing actual innocence claim is the kind of claim that can be heard in a second or successive habeas petition).

### III.     Conclusion

For all of these reasons, Bolin's motion for leave to file a second or successive petition for writ of habeas corpus is DENIED. His motion for a stay of execution is also DENIED.